**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LEAH EVANS** and **SEMAJ CARTER,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:21cv413 |
| | ) | **Electronic Filing** |
| **MICHAEL CATANZARO** and | ) | |
| **LUCAS SZYMANSKI,** | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

Leah Evans and Semaj Carter (collectively "plaintiffs") commenced this civil rights action pursuant to 42 U.S.C. § 1983 seeking redress for alleged violations of their Fourth Amendment rights. Two motions for summary judgment filed by Michael Catanzaro and Lucas Szymanski (collectively "defendants") are presently before the court. For the reasons set forth below, the motions will be granted.

Federal Rule of Civil Procedure 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(A). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007). Deciding a summary judgment motion requires the court to view the facts, draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. See Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001).

The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof

1

on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim.  Nat'l State Bank v. Fed. Reserve Bank of New York, 979 F.2d 1579, 1581–82 (3d Cir. 1992).  Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law.  Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(E)).  An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and "cannot simply reassert factually unsupported allegations."  Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs."  Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992); Sec. & Exch. Comm'n v. Bonastia, 614 F.2d 908, 914 (3d Cir. 1980) ("[L]egal conclusions, unsupported by documentation of specific facts, are insufficient to create issues of material fact that would preclude summary judgment.").

Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion.  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382–83 n.12 (3d Cir. 1990).  If the non-moving party's evidence is merely colorable or lacks sufficient probative force, summary judgment may be granted.  Anderson, 477 U.S. at 249–50; see also Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) (explaining that although the court is not permitted to

weigh facts or competing inferences, it is not required to "turn a blind eye" to the weight of the evidence).

The record as read in the light most favorable to plaintiffs establishes the background set forth below.  Plaintiffs' claims of unlawful search and seizure and false imprisonment in violation of the Fourth Amendment arise from an incident that occurred on August 14, 2019. On that date, Leah Evans ("Evans") arrived at her home at approximately 1:40 p.m. after running errands to find her son, Semaj Carter ("Carter"), and his two friends, Natrell and Tyriek Jeffries.  Upon Evans' return, Carter asked her if she could drive Natrell and Tyriek back to their house and take him to the bank to cash his paycheck.  Evans agreed and they all got in her car—Evans drove, Carter sat in the passenger seat, and Natrell and Tyriek were in the backseat.  ECF No. 81 ¶ 40.  Shortly into their drive, Evans was just about to turn right at an intersection when the passengers in her vehicle told her to turn left instead.  Evans Dep. (ECF No. 82-3) at 43:15–18.[1]  As a result, Evans made an abrupt left turn without using her turn signal.  Id. at 48:7–15.

Detectives Michael Catanzaro ("Catanzaro") and Christopher Minton ("Minton") of the Wilkinsburg Police Department were traveling immediately behind Evans in a Chevy Tahoe when she made this abrupt turn.  Catanzaro Dep. (ECF No. 85-3) at 27:9–18.  The detectives observed Evans fail to use a turn signal and subsequently initiated a traffic stop.  Id. at 35:20–24.  For approximately twenty minutes prior to the stop, Catanzaro and Minton had been patrolling the Wilkinsburg area.  Id. at 32:5–8.  One of Catanzaro's primary job duties was to drive around "higher crime areas" and "look for violations of the law."  Id. at 22:3–12.

---

[1] The citations to depositions refer to the original page numbers, rather than the numbering generated by ECF.

The detectives activated their lights and sirens and Evans pulled over.  Evans Dep. at 52:8–10.  Catanzaro and Minton parked behind Evans, then a second vehicle, a silver truck, pulled in behind their Tahoe.  Id. at 53:1–7; Carter Dep. (ECF No. 82-2) at 25:4–7.  As Evans' vehicle was coming to a rest, Catanzaro saw the left backseat passenger turn to look behind them and then lean back "as to straighten his waist."  Catanzaro Dep. at 36:16–18.  Catanzaro described these actions as hurried and furtive in nature based on his training and experience.  Id. at 3–4.

Plaintiffs saw several law enforcement officers exit the two vehicles.  Evans Dep. at 52:16–25; Carter Dep. at 20:23–21:1.  Catanzaro and Minton exited the Tahoe while Lucas Szymanski ("Szymanski"), Michael Maroni ("Maroni"), and Aaron Francis ("Francis") exited the silver truck.  ECF No. 81 ¶¶ 45, 50.  Szymanski and Maroni were probation officers for Allegheny County and Francis was a special agent for the Federal Bureau of Investigation ("FBI").  Maroni and Francis were both assigned to the FBI Safe Streets Gang Task Force and Szymanski was the probation officer for Natrell Jeffries at that time.  See Francis Decl. (ECF No. 82-8) ¶ 2; Szymanski Dep. (ECF No. 82-7) at 16:1–3.

The officers surrounded Evans' vehicle with their guns pointed at the occupants.[2] Evans Dep. at 51:20–23; 55:15–21.  Catanzaro approached the vehicle's backseat area on the passenger side while Minton went and stood next to the driver's side door.  Catanzaro Dep. at 39:7–9.  Both Catanzaro and Minton testified that they smelled a heavy odor of marijuana emanating from inside the vehicle.  Id. at 41:1–2; Minton Dep. (ECF No. 85-5) at 41:17–24.  Evans went to open her door and one of the officers told her to "shut the eff up" and "stay in the car," and threatened to "blow [her] head off."  Evans Dep. at 57:22–25.  Minton asked

---

[2] Catanzaro, Szymanski, Minton, Maroni, and Francis all disavowed drawing their weapons at any point during their interaction with plaintiffs.

Evans for her identification and told her that she had committed a traffic violation.  Id. at 58:24–59:8.

Catanzaro opened the rear back door and asked the passenger closest to him, Natrell Jeffries, to step out of the car.  Catanzaro Dep. at 50:15–17.  After Natrell exited, Catanzaro asked the second passenger, Tyriek Jeffries, to scoot towards him and step out as well.  Id. at 21–23.  Once Tyriek exited the vehicle, Catanzaro asked him to place his hands on the side of the vehicle and began to pat him down.  Id. at 51:3–9.  Catanzaro felt an object in Tyriek's waistband, so he handcuffed him and walked him behind the Tahoe.  Id. at 53:12–54:5.

At some point, Minton opened Carter's door and started pulling him out of the car. Carter Dep. at 36:10–15.  Evans tried to keep Carter inside the vehicle, which resulted in a "kind of . . . tug-of-war" between her and Minton over Carter.  Evans Dep. at 61:13–18. Eventually, Evans stopped and Carter exited the vehicle on his own.  Carter Dep. at 36:23– 37:10.  Minton patted Carter down and found approximately $1,600 in cash on him.  Id. at 22:21–23:15; Minton Dep. at 52:2–4.  Minton asked Carter why he was carrying such a "large amount" of cash that "is not commonly carried on a person."  Minton Statement (ECF No. 82-10) at 2.  Carter explained that he received a physical paycheck from his work every Wednesday which he would cash at the bank promptly upon receipt.  Carter Dep. at 23:22– 24:4.  Minton handcuffed Carter "for further investigation" and "until [the] scene was completely calmed down."  Minton Dep. at 41:4–7.

Meanwhile, behind the Tahoe, Catanzaro mirandized Tyriek and asked him about the bulge in his pants.  Catanzaro Dep. at 56:1–5.  Tyriek told him it was marijuana.  Id. Catanzaro retrieved the marijuana and then asked Tyriek if he had anything else on him; Tyriek said he had a digital scale and a cellphone in his pockets.  Id. at 5–10.  Catanzaro confiscated

the scale because it "could be indicative of distribution," then he and Tyriek rejoined the group. Catanzaro Statement (ECF No. 85-4) at 4; id. at 58:21–23.

The officers handcuffed Carter, Tyriek, and Natrell and sat them on the ground. Evans Dep. at 62:7–13. During this time, Szymanski asked his supervisee, Natrell, what was happening and if he was going to be charged with anything. Szymanski Dep. at 25:24–25. Natrell told him that they had been pulled over and that he was not going to be charged, then they spoke about his "normal month-to-month contact" information. Id. at 27:4–10.

Eventually, Evans was asked to step out of the vehicle. Evans Dep. at 94:8–9. At some point, Catanzaro advised her that the vehicle smelled like marijuana and that he was going to search it. Catanzaro Dep. at 63:19–24. Evans also testified that she gave the police officers permission to search her vehicle. Evans Dep. at 74:20–75:7. Catanzaro and Minton searched her vehicle while the other officers watched Carter, Tyriek, and Natrell. Id. at 95:2–6; Minton Dep. at 43:13–19. Afterwards, the officers advised them that they were free to leave. Catanzaro Dep. at 68:4–7. No one was charged as a result of this stop and the entire encounter lasted approximately twenty minutes. Id. at 69:3–4; Evans Dep. at 75:12–19.

Plaintiffs' claim of false imprisonment in violation of the Fourth Amendment against Catanzaro and Szymanski arises from the officers detaining them at gunpoint for approximately twenty minutes. And their unlawful search and seizure claim against Catanzaro stems from the allegedly improper search of Evans' vehicle.[3] Defendants move for summary judgment on each of plaintiffs' remaining claims.

Catanzaro maintains that the smell of marijuana emanating from the vehicle, as well as the subsequent discovery of marijuana and drug paraphernalia on one of the passengers, gave

---

[3] Within plaintiffs' briefing, Carter withdrew his claims against Catanzaro regarding the search of his person at Count I and being placed in handcuffs at Count II. ECF No. 80 at 3 n.1, 6 n.8. Accordingly, the court does not address these claims in its analysis.

rise to probable cause to search the vehicle under the law at the time. Moreover, Evans reportedly acquiesced to the search of the vehicle, which destroys plaintiffs' claim that the search was unlawful. Therefore, the search of plaintiffs' vehicle and their corresponding temporary detention were both lawful. So, from Catanzaro's perspective, plaintiffs' Fourth Amendment claims for unlawful search and false imprisonment fail. As for Szymanski, he argues that he cannot be liable under § 1983 because plaintiffs have failed to establish his personal involvement in the complained-of misconduct. Lastly, both defendants argue that, in any event, they are entitled to qualified immunity.

In response, plaintiffs maintain that the parties have presented conflicting narratives regarding the search of Evans' vehicle such that material issues of fact remain regarding the existence of probable cause. In particular, plaintiffs testified that no one was smoking marijuana before or during the traffic stop and Evans testified that her vehicle did not smell like marijuana. Moreover, the search of the vehicle did not produce any evidence of burnt marijuana and Catanzaro's report memorializing his interaction with plaintiffs failed to mention the smell of burnt marijuana. And Evans assertedly did not consent to the search of her vehicle freely, but rather she felt compelled to do so because she was in the presence of "people with guns." ECF No. 80 at 6. Moreover, because Szymanski was among the group of officers that drew their weapons and detained plaintiffs while Catanzaro and Minton searched their vehicle, plaintiffs maintain that they have sufficiently identified his personal involvement in violating their constitutional rights. Finally, they argue that defendants are not entitled to qualified immunity because the facts in the record are sufficient to support a finding that no reasonable law enforcement officer could have believed that probable cause existed.

Although plaintiffs maintain that material issues of fact remain as to whether defendants lacked probable cause to detain them and search their vehicle, thereby violating

plaintiffs' Fourth Amendment rights to be free from an unreasonable search and unlawful detention, the applicable standards of review dictate that defendants are entitled to summary judgment on the claims which turn on the existence or lack of probable cause.

At the outset, we agree that plaintiffs have failed to establish sufficiently Szymanski's personal involvement in the alleged constitutional violations.  Because vicarious liability is inapplicable to § 1983 suits, plaintiffs must show that each defendant, "through their own individual actions, has violated the Constitution."  Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 290 (3d Cir. 2018) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009)).  "This requirement of 'personal involvement in the alleged wrongs' may 'be shown through allegations of personal direction or of actual knowledge and acquiescence.'"  Price v. City of Philadelphia, 239 F. Supp. 3d 876, 894 (E.D. Pa. 2017) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207–1208 (3d Cir. 1988)).  "A showing of actual knowledge must be made with appropriate particularity."  Id. (internal quotation marks and citation omitted).

Here, plaintiffs' claims against Szymanski fail to meet this standard—there are no facts in the record setting forth any individual actions he took that violated their constitutional rights. While plaintiffs have produced evidence identifying other officers who were present during the incident—and even describing the specific interactions they had with a few of them—the record is devoid of any such evidence regarding Szymanski.  While they maintain that Szymanski was among the group of officers who drew their weapons and detained them during the search of their vehicle, they have failed to support this contention with the requisite "affirmative evidence" needed to survive summary judgment.  Williams, 891 F.2d at 460.

Nor does the evidence support an inference that Szymanski knew that the other officers' search of the vehicle and plaintiffs' concurrent detention were unlawful—in fact, the evidence suggests that Szymanski had learned about the events that occurred prior to his arrival on the

scene from Natrell.  And plaintiffs have failed to present any evidence challenging Szymanski's contention that Natrell Jeffries was the only individual he interacted with during this incident. While Szymanski may have been among the group of officers on the scene during the underlying event, his "mere presence" is insufficient to demonstrate his personal involvement in the conduct that underlies plaintiffs' Fourth Amendment claims.  Witters v. Smith, 736 F. Supp. 3d 238, 247 (M.D. Pa. 2024).  Accordingly, Szymanski is entitled to summary judgment on plaintiffs' claim for false imprisonment in violation of the Fourth Amendment.

Turning to plaintiffs' remaining claims, we begin with the baseline principle that, in general, § 1983 does not itself create substantive rights, but instead provides a vehicle for vindicating a violation of a federal right.[4]  Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  A cause of action under § 1983 has two elements: a plaintiff must prove (1) a violation of a right, privilege, or immunity secured by the constitution and laws of the United States (2) that was committed by a person acting under color of state law.  Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996); Kelly v. Borough of Sayreville, 107 F.3d 1073, 1077 (3d Cir. 1997); Berg v. Cty. of Allegheny, 219 F.3d 261, 268 (3d Cir. 2000) ("[T]he plaintiff must demonstrate that a person acting under color of law deprived him of a federal right.").  Here, it is undisputed that defendants acted under color of law.

Second, "the exact contours of the underlying right said to have been violated" must be determined.  Berg, 219 F.3d at 268 (citing City of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)).  To that end, the Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.

---

[4] Section 1983 creates liability against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983.

Const. amend. IV.  Plaintiffs allege that Catanzaro violated this right by subjecting them to an unlawful search and false imprisonment.

 To state a claim for an unreasonable search, plaintiffs must show that Catanzaro's "actions constituted a 'search' or 'seizure' within the meaning of the Fourth Amendment and were 'unreasonable' under the circumstances." <u>Verdier v. Borough</u>, 796 F. Supp. 2d 606, 619 (E.D. Pa. 2011) (quoting <u>Brower v. County of Inyo</u>, 489 U.S. 593, 599 (1989)).  For a search to be reasonable under the Fourth Amendment, "it must be effectuated with a warrant based on probable cause" unless an exception applies.  <u>United States v. Robertson</u>, 305 F.3d 164, 167 (3d Cir. 2002).

 Here, it is uncontested that Catanzaro and Minton conducted a warrantless search of Evans' vehicle, but the parties dispute whether the search fell under the well-established "automobile exception" to the Fourth Amendment's warrant requirement.  This exception "permits vehicle searches without a warrant if there is probable cause to believe that the vehicle contains evidence of a crime." <u>United States v. Griffith</u>, 598 F. Supp. 3d 221, 232 (M.D. Pa. 2022).  So, the validity of the search in this case depends on whether the officers had probable cause to believe that the vehicle contained contraband or evidence of a crime.  <u>See</u> <u>United States v. Donahue</u>, 764 F.3d 293, 302–03 (3d Cir. 2014) (rejecting any distinction between "evidence of a crime" and "contraband" for Fourth Amendment purposes).

 As for a claim of false imprisonment, plaintiffs must establish that: (1) they were detained; and (2) the detention was unlawful.  <u>See</u> <u>Harvard v. Cesnalis</u>, 973 F.3d 190, 202 (3d Cir. 2020).  When law enforcement lacks "probable cause to make an arrest, the arrestee has a claim under § 1983 for false imprisonment based on a detention pursuant to that arrest." <u>Groman v. Twp. of Manalapan</u>, 47 F.3d 628, 636 (3d Cir. 1995).  "A § 1983 false imprisonment claim based on an arrest without probable cause is grounded in the Fourth Amendment guarantee

against unreasonable seizures." <u>Garcia v. Cnty. of Bucks, Pa.</u>, 155 F. Supp. 2d 259, 265 (E.D. Pa. 2001). It follows that, like their unlawful search claim, plaintiffs' false imprisonment claim will also turn on the existence of probable cause. <u>See</u> <u>Groman</u>, 47 F.3d at 636 ("[A]n arrest based on probable cause could not become the source of a claim for false imprisonment.").[5]

The existence of probable cause to support a search requires a "fair probability that contraband or evidence of a crime will be found in a particular place." <u>United States v. Burton</u>, 288 F.3d 91, 103 (3d Cir. 2002). In assessing probable cause, a court must evaluate the events which occurred leading up to the search, then determine "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer" amount to probable cause. <u>Ornelas v. United States</u>, 517 U.S. 690, 696 (1996).

"The probable cause inquiry is 'commonsense,' 'practical,' and 'nontechnical;' it is based on the totality of the circumstances and is judged by the standard of 'reasonable and prudent men.'" <u>Donahue</u>, 764 F.3d at 301 (quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 230–31 (1983)). It is "a 'fluid concept' that 'turn[s] on the assessment of probabilities in particular factual contexts.'" <u>United States v. Stearn</u>, 597 F.3d 540, 554 (3d Cir. 2010) (quoting <u>Gates</u>, 462 U.S. at 232). If probable cause justifies a vehicle search, "it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." <u>Donahue</u>, 764 F.3d at 300.

In general, the question of probable cause in a § 1983 damages suit is a question of fact for the jury, unless there is only one reasonable determination possible. <u>Montgomery v. De</u>

---

[5] Plaintiffs do not assert that they were never placed under arrest such that that their false imprisonment claim only requires them to show that they were detained without reasonable suspicion that a crime had been committed. <u>See</u> <u>Gwynn v. City of Phila.</u>, 719 F.3d 295, 304 n.4 (3d Cir. 2013). In any event, because we ultimately find that probable cause existed, "our probable cause analysis suffices" for an evaluation under the reasonable suspicion standard because "reasonable suspicion is a 'less demanding' standard than probable cause." <u>Cost v. Borough of Dickson City</u>, 858 F. App'x 514, 518 n.8 (3d Cir. 2021) (quoting <u>United States v. Ritter</u>, 416 F.3d 256, 263 n.7 (3d Cir. 2005)).

Simone, 159 F.3d 120, 124 (3d Cir. 1998); Ingram v. Lupas, 353 F. App'x. 674, 677–78 (3d Cir. 2009).  In this context, "summary judgment is only appropriate if 'a reasonable jury could not find a lack of probable cause.'"  Dempsey v. Bucknel University, 834 F.3d 457, 467 (3d Cir. 2016) (quoting Montgomery, 159 F.3d at 124).  In other words, "a district court may conclude that probable cause did exist as a matter of law if the evidence, viewed most favorably to Plaintiff, reasonably would not support a contrary factual finding, and may enter summary judgment accordingly."  Estate of Smith v. Marasco, 318 F.3d 497, 514 (3d Cir. 2003) (internal quotation marks and citation omitted).

 Against the above backdrop, the critical inquiry is whether the record establishes that at the time Catanzaro and Minton searched Evans' vehicle, the objective facts within their ken gave rise to a reasonable belief that there was a fair probability that the vehicle contained contraband or evidence of a crime.  We conclude that they did.  In other words, the objective facts as they then existed gave rise to probable cause to search the vehicle.

The following objective facts were known to the officers at the critical moment in time. After stopping Evans for failing to use a turn signal, Catanzaro observed a passenger in the backseat making furtive movements.  Then, as he and Minton approached the vehicle, they smelled a heavy odor emanating from inside that they both believed to be marijuana.  Based on Catanzaro's observations, he ordered the backseat occupants to exit the vehicle to perform a pat-down search of Tyriek Jeffries.  During that protective frisk—which is not at issue here—Catanzaro felt a bulge in his pants, so he handcuffed Tyriek and walked him behind the Tahoe for questioning.  And at some point during this time, Minton found a large amount of cash in Carter's possession.  Finally, while speaking with Tyriek, Catanzaro recovered marijuana and a digital scale from his pockets.

The above information and circumstances existed and were made known to the officers before they searched plaintiffs' vehicle. While plaintiffs argue that the record reasonably supports an inference that Catanzaro and Minton did *not* actually smell marijuana inside their vehicle, they do not advance affirmative evidence to contradict in any adequate manner the information the officers observed and became aware of at this point. For example, plaintiffs emphasize that the search of the vehicle did not produce any evidence of burnt marijuana and that Catanzaro's report memorializing the underlying incident failed to mention the smell of burnt marijuana. Moreover, Evans testified that she did not smell marijuana inside her vehicle. Lastly, plaintiffs highlight Carter's testimony disavowing that they had smoked marijuana beforehand and Evans' testimony that no one was smoking it in the vehicle.

The issue thus presented is whether the above-referenced information can straightforwardly be considered in determining whether the officers had sufficient justification to search the vehicle. In other words, can the general challenges to this information by plaintiffs create material issues of fact or otherwise require that a jury consider the question of whether probable cause existed? The Third Circuit appears to have answered this question by requiring a showing that actually creates a material dispute about the claimed information possessed by the officers and/or the observations and inferences they made/drew at the time. Merely attempting to discount such information pursuant to the summary judgment standard will not suffice to defeat an otherwise supported showing of probable cause.

As the court in Dempsey observed, "[t]here is a tension inherent in evaluating probable cause at the summary judgment stage." 834 F.3d at 468. On one hand, the standard at summary judgment asks whether there is a genuine dispute as to any material fact while viewing the evidence in the light most favorable to the non-moving party. Id. At the same time, "the probable cause standard by definition allows for the existence of conflicting, even irreconcilable,

evidence." Id. (citing Wright v. City of Phila., 409 F.3d 595, 603 (3d Cir. 2005)).  In reconciling

these competing principles, the court held:

> While it is axiomatic that at the summary judgment stage, we view the facts in the light most favorable to the nonmoving party, it does not follow that we exclude from the probable cause analysis unfavorable facts an officer otherwise would have been able to consider.  Instead, we view *all* such facts and assess whether any reasonable jury could conclude that those facts, considered in their totality in the light most favorable to the nonmoving party, did not demonstrate a "fair probability" that a crime occurred.  Only then would the existence of conflicting evidence rise to the level of a "genuine dispute as to any material fact" such that summary judgment would be inappropriate.  Thus, where the question is one of probable cause, the summary judgment standard must tolerate conflicting evidence to the extent it is permitted by the probable cause standard.

Id.

Within this background, we will credit plaintiffs' version of events, as we must at this

point, and assume that none of the occupants had smoked marijuana before or during the traffic

stop.  But, although Evans testified that *she* did not smell marijuana in the vehicle, Carter's

testimony on this point is less clear.  Evans Dep. at 64:18–25 ("Q: If the officer said they smelled

an odor of marijuana coming from the vehicle, do you know where that was coming from? A:

No. Q: Did you smell any marijuana in the vehicle? A: No.").  When Carter was asked if he

disagreed that, at some point, the officers smelled an odor of marijuana coming from the vehicle,

he responded that he "couldn't disagree with [that], they found it."  Carter Dep. at 43:23–44:4.

And the court cannot disregard Evans' testimony admitting she may have consumed prescription

"cannabis CBD" before the traffic stop on August 14, 2019 because she had a medical marijuana

card authorizing her to use it.  Evans Dep. at 92:11–21.  Nor can it ignore the fact that she

typically administers her prescription CBD through a vape.  Id. at 93:4–5.  Accordingly, the

court must determine whether Evans' assertion that she did not smell marijuana inside her

vehicle is sufficient to establish a genuine dispute as to whether the officers smelled marijuana

emanating from the vehicle.

14

With respect to the smell of marijuana, it is "well settled" that if the odor is "articulable and particularized," it "may establish not merely reasonable suspicion, but probable cause." United States v. Ramos, 443 F.3d 304, 308 (3d Cir. 2006). "[S]o long as the smell of marijuana can be particularized to a specific person or place, it is sufficient to establish probable cause." United States v. Jackson, 682 F. App'x 86, 88 (3d Cir. 2017).

Here, it is undisputed that the vehicle's doors were opened promptly after Catanzaro and Minton approached it. And while the parties dispute whether the vehicle actually smelled like marijuana, both officers testified that, even standing on opposite sides of the car, they each detected a strong odor coming from inside that they believed to be marijuana. Based on these observations, the officers pinpointed plaintiffs' vehicle as the source of the odor with sufficient particularity.

To the extent plaintiffs dispute that the officers "actually detected" what they "believed at the time to be the odor of marijuana," they have "failed to raise a triable issue." Morgan v. Borough of Fanwood, 680 F. App'x 76, 83 (3d Cir. 2017). Plaintiffs do not dispute that Catanzaro recovered marijuana and a digital scale from one of their passengers. Nor do they dispute that this discovery occurred *prior* to the officers conducting a search of the vehicle. See, e.g., United States v. Lackey, No. 20-2977, 2022 WL 313807, at *2 (3d Cir. Feb. 2, 2022) (concluding that the odor of marijuana emanating from the vehicle, alone, provided probable cause to search it, and that probable cause was "further supported" by "[o]ther factors," including the presence of marijuana found on the passenger's person); United States v. Wimbush, No. CR 19-134, 2020 WL 1873020, at *17 (D.N.J. Apr. 15, 2020) ("Additionally, the fact that marijuana was found on [the passenger's] person prior to the search of the [vehicle] did not preclude the officers from searching the vehicle."); United States v. Neal, No. 4:17-CR-00255, 2018 WL 3008488, at *5 (M.D. Pa. June 15, 2018) (holding that not only was the smell of marijuana

emanating from the vehicle "sufficient to establish probable cause under the automobile exception," but that this finding was "further bolstered by the actual discovery of marijuana . . . on [the defendant's] person.").

These existing facts and perceived circumstances strongly support a reasonable inference that there was "at least a 'fair probability' that additional evidence related to one or more drug offenses would be found within the vehicle." United States v. Rodriguez-Mercado, 788 F. App'x 97, 100 (3d Cir. 2019) (quoting Donahue, 764 F.3d at 301). Evans' assertion that she did not smell marijuana inside her car, standing alone, "does not refute the officers' testimony" that they detected an odor that they perceived to be marijuana, which was further bolstered by the discovery of marijuana on one of the passengers. Roberts v. Twp. of Upper Darby, No. 2:10-CV-190, 2012 WL 5928993, at *6 (E.D. Pa. Nov. 26, 2012). So, although Catanzaro and Minton "may have made a mistake" about the smell they detected inside the vehicle, "their belief was not unreasonable in light of the information the officers possessed at the time." Wright, 409 F.3d at 603.

Further, plaintiffs' strong emphasis on the lack of any evidence of burnt marijuana recovered from the search and Catanzaro's failure to memorialize the smell of burnt marijuana in his report is misplaced. The focus of the probable cause inquiry is the information available to the officers *at the time* of the search and the court's role "is not that of the much-maligned 'Monday morning quarterback' whose critiques are made possible only by the benefits of hindsight." Dempsey, 834 F.3d at 469. In addition, because "sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment," these facts do not have a direct bearing on the existence of probable cause. Hill v. California, 401 U.S. 797, 804 (1971).

As a final note, both parties briefly raise the issue of whether Evans consented to the search of her vehicle given that "one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). However, Catanzaro has failed to proffer any evidence showing that the search of Evans' vehicle was conducted pursuant to her consent. Rather, Catanzaro testified that he never asked Evans for consent to search the vehicle, and to the best of his knowledge, neither did Minton. See Catanzaro Dep. at 62:8–21. So, while Evans' consent is an ancillary issue addressed in the parties' briefing, it seems illogical to analyze the validity of a search based on consent when there is no evidence that the officer was even aware that consent was given. Notwithstanding this, because plaintiffs' counter evidence fails to undermine meaningfully or sufficiently dispute the objective facts and reasonable inferences supporting the existence of probable cause, defendants are entitled to summary judgment on plaintiffs' claims for unlawful search and false imprisonment in violation of the Fourth Amendment.

Even assuming for the sake of argument that plaintiffs proffered sufficient evidence to permit a finding that a reasonable officer could have found a lack of probable cause at the time of the search and their concomitant detention, the doctrine of qualified immunity provides defendants with a complete defense and immunity from suit. The doctrine of qualified immunity provides that "government officials performing discretionary functions . . . are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Under this doctrine, government officials are immune from suit in their individual capacities unless, "taken in the light most favorable to the party asserting [a deprivation of a constitutional violation resulting in harm or injury], . . . the facts alleged show

17

the officer's conduct violated a constitutional right" and "the right was clearly established" at the time of the deprivation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).

Qualified immunity is "an entitlement not to stand trial or face the burdens of litigation." Id. at 200 (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).  A government official performing discretionary functions is immune from claims for damages unless the evidence of record as read in the light most favorable to the non-moving party will support findings that (1) the official violated the plaintiff's constitutional rights, and (2) the constitutional right that was violated was clearly established.  Id. at 201.  The courts retain discretion in deciding which of the two prongs of this analysis should be addressed first.  Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Qualified immunity is an affirmative defense and the burden of proving the prerequisites for its application rests with the party seeking to invoke it.  Thomas v. Independence Twp., 463 F.3d 285, 292 (3d Cir. 2006); Hicks v. Feeney, 850 F.2d 152, 159 (3d Cir. 1988).  "The issue of qualified immunity is generally a question of law, although a genuine issue of material fact will preclude summary judgment on qualified immunity."  Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009).  In deciding qualified immunity questions at summary judgment, a court must view the facts in the light most favorable to the plaintiff.  Id.

The doctrine "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson, 555 U.S. at 231; accord Burns v. Pa. Dept. of Corrections, 642 F.3d 163, 176 (3d Cir. 2011).  And where its protections are appropriate, the immunity "applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."  Pearson, 555 U.S. at 231 (internal quotation marks and citation

omitted).  Thus, when properly applied, qualified immunity "protects 'all but the plainly

incompetent or those who knowingly violate the law.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 743

(2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

     Here, both defendants argue they are entitled to qualified immunity as to plaintiffs'

Fourth Amendment claims.  Catanzaro argues that a reasonable officer would have believed that

probable cause existed to search the vehicle and preexisting law did not clearly identify his

actions as unconstitutional under the circumstances confronting him.  And Szymanski asserts

that "any inferences that could be made" regarding his actions "would be justified by

[Catanzaro's] direct observations."  ECF No. 72 at 3.

     Plaintiffs argue that the facts in the record are sufficient to support a finding that the

search of the vehicle and, consequently, their detention attendant to that search, were not

supported by probable cause.  Therefore, from plaintiffs' perspective, the record supports a

finding that no reasonable officer could have believed that probable cause existed to detain

them for approximately twenty minutes while their vehicle was unlawfully searched, thereby

defeating any claim of qualified immunity.

     Under the first prong of a qualified immunity analysis, it was generally established at the

time of the traffic stop that the interior of a vehicle was protected by the Fourth Amendment

constitutional right to be free from unreasonable search and seizures.  See, e.g., New York v.

Class, 475 U.S. 106, 114–15 (1986) ("While the interior of an automobile is not subject to the

same expectations of privacy that exist with respect to one's home, a car's interior as a whole is

nonetheless subject to Fourth Amendment protection from unreasonable intrusions by the

police."); Cady v. Dombrowski, 413 U.S. 433, 439 (1973) (acknowledging that "vehicles are

'effects' within the meaning of the Fourth Amendment," even though "there is a constitutional

difference between houses and cars.").  Thus, the right as a general matter is firmly established.
But cf. Carroll v. United States, 267 U.S. 132 (1925) (establishing the automobile exception).

Turning to the second prong of the qualified immunity analysis, which asks whether "at
the time of the officer's conduct, the law was sufficiently clear that every reasonable official
would understand that what he is doing is unlawful."  District of Columbia v. Wesby, 583 U.S.
48, 63 (2018); James v. New Jersey State Police, 957 F.3d 165, 169 (3d Cir. 2020) (same).  The
purpose of this inquiry is to account for "the reality that 'reasonable mistakes can be made as to
the legal constraints on particular police conduct.'"  Santini v. Fuentes, 795 F.3d 410, 418 (3d
Cir. 2015) (quoting Curley v. Klem, 499 F.3d 199, 207 (3d Cir. 2007)).

This prong of the qualified immunity standard inverts the standard applicable at summary
judgment by requiring that "there can be no liability on the part of the arresting officer unless 'no
reasonably competent officer' would conclude that probable cause existed."  Dempsey, 834 F.3d
at 468 n.6 (quoting Malley, 475 U.S. at 341).  This assessment involves "an 'objective (albeit
fact-specific) question,' under which '[an officer]'s subjective beliefs . . . are irrelevant.'"  James,
957 F.3d at 169 (alterations in original) (quoting Anderson v. Creighton, 483 U.S. 635, 641
(1987)).  The inquiry is undertaken from the perspective of a reasonable officer, and "only the
facts that were knowable to the defendant officer" are taken into account.  Id. (quoting White v.
Pauly, 580 U.S. 73, 77 (2017)).

In "rare" instances, "a plaintiff might be able to show that a right is clearly established if
the 'violation [is] obvious.'"  Id. (alteration in original) (citing Brosseau v. Haugen, 543 U.S. 194,
199 (2004) (quoting Hope v. Pelzer, 536 U.S. 730, 738 (2002)).  In other words, "qualified
immunity is not appropriate when the case in question presents 'extreme circumstances' to which
'a general constitutional rule already identified in the decisional law may apply with obvious
clarity.'"  Thomas v. City of Harrisburg, 88 F.4th 275, 284 (3d Cir. 2023) (quoting Brosseau, 543

U.S. at 199); cf. Kane v. Barger, 902 F.3d 185, 195 (3d Cir. 2018) ("This is because, given the egregiousness of Barger's violation of Kane's personal security and bodily integrity, the right here is so 'obvious' that it could be deemed clearly established even without materially similar cases.").

Otherwise, "in most cases, a plaintiff must show that a right is clearly established because 'the violative nature of [the] particular conduct [was] clearly established.'" James, 957 F.3d at 169 (quoting Ziglar v. Abbasi, 582 U.S. 120, 151 (2017)).  "In other words, 'settled law' . . . must 'squarely govern[ ] the specific facts at issue.'" Id. (second alteration in original) (first quoting Wesby, 583 U.S. at 63; then quoting Kisela v. Hughes, 584 U.S. 100, 104 (2018)).  This standard can be satisfied by identifying a case where an officer acting under similar circumstances was held to have violated the constitutional provision at issue.  James, 957 F.3d 169–70 (quoting White, 580 U.S. at 79).

In this setting, "clearly established rights are derived either from binding Supreme Court and Third Circuit precedent or from a robust consensus of cases of persuasive authority in the Courts of Appeals."  Bland v. City of Newark, 900 F.3d 77, 84 (3d Cir. 2018) (internal quotation marks and citation omitted); accord Wesby, 583 U.S. at 63 ("To be clearly established, a legal principle must . . . [be] dictated by controlling authority or a robust consensus of cases of persuasive authority[.]").  A case directly on point is not required to show a right is clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).  In other words, "there must be sufficient precedent at the time of the action, factually similar to the plaintiff's allegations, to put [the] defendant on notice that his or her conduct is constitutionally prohibited."  McLaughlin v. Watson, 271 F.3d 566, 572 (3d Cir. 2001).

Here, at the time of the underlying incident, the smell of marijuana could establish the requisite probable cause to search a vehicle under the automobile exception.  See, e.g., Ramos, 443 F.3d at 308; United States v. Ushery, 400 F. App'x 674, 676 (3d Cir. 2010).  And Pennsylvania law was in accord with this principle at the time.  See Commonwealth v. Gary, 91 A.3d 102, 138 (Pa. 2014) (finding probable cause to search a vehicle where police could smell marijuana emanating from inside), overruled by Commonwealth v. Alexander, 243 A.3d 177 (Pa. 2020).

Prior to the search of the vehicle, both Catanzaro and Minton had detected an "articulable and particularized" odor emanating from inside that they believed to be marijuana.  Ramos, 443 F.3d at 308.  And this belief was further bolstered when Catanzaro recovered marijuana and a digital scale from one of the passengers.  Indeed, Carter even admitted that he could not contest that the officers smelled marijuana coming from inside the vehicle at some point because they had found it.  Under the above settled law, these undisputed facts establish that Catanzaro is entitled to qualified immunity because "a reasonable officer could have believed that probable cause existed" to search plaintiffs' vehicle.  Hunter v. Bryant, 502 U.S. 224, 228 (1991) (per curiam).

Even assuming *arguendo* that Catanzaro and Minton did not actually smell marijuana emanating from inside plaintiffs' vehicle and they erred in concluding probable cause existed, Catanzaro "nevertheless would be entitled to qualified immunity because [his] decision was reasonable, even if mistaken."  Id. at 229.  The Supreme Court has "recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present," and in such instances, "those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable."  Anderson, 483 U.S. at 641.  So, to the extent the officers incorrectly determined that they

smelled marijuana inside plaintiffs' vehicle, we cannot conclude that their belief was objectively unreasonable in light of the objective facts and circumstances available to them at the time.

Moreover, there was insufficient precedent to place Catanzaro on notice that incorrectly identifying an odor as marijuana was a clear violation of plaintiffs' constitutional right to be free from unreasonable search and seizures. Even assuming the officers did not have probable cause to search the vehicle because they erroneously concluded that they smelled marijuana emanating from the vehicle, plaintiffs have failed to identify any precedent that holds that a constitutional violation has occurred in a factually analogous scenario.

Plaintiffs have not identified any Supreme Court or Third Circuit case that recognizes under similar facts and circumstances—namely, that an officer searching a vehicle after detecting an odor emanating from inside which he mistakenly believed to be marijuana and recovering marijuana from one of the vehicle's passengers prior to the search—violates the Fourth Amendment. Similarly, they have not cited to a robust collection of cases from the federal courts of appeals that support such a proposition. To the contrary, plaintiffs merely cite this court's prior opinion denying Szymanski's motion to dismiss which recognized that the constitutional right to be free from seizure without probable cause was firmly established prior to August 14, 2019. See Evans v. Catanzaro, No. 2:21CV413, 2024 WL 4122245, at *3 (W.D. Pa. Sept. 9, 2024); see also ECF Nos. 80, 83. Thus, plaintiffs have failed to identify a robust consensus of precedent predicated on substantially similar facts and circumstances that gave every reasonable officer notice that temporarily detaining plaintiffs to conduct a search of their vehicle would constitute a violation of their constitutional rights.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." al-Kidd, 563 U.S. at 743. And even where a clearly established constitutional right has been violated, if the officer's mistake as to what the

law requires was reasonable, then qualified immunity shields the officer from liability.

Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004).  Applied in this manner,

the doctrine "protects 'all but the plainly incompetent or those who knowingly violate the law.'"

al-Kidd, 563 U.S. at 743 (quoting Malley, 475 U.S. at 341).

　　　　Here, assuming the previous deficiencies in plaintiffs' case can somehow be

overlooked, plaintiffs have done nothing more than demonstrate that defendants made a

reasonable mistake about the scope of the law as it related to plaintiffs' conduct.  Consequently,

defendants are entitled to qualified immunity for this reason as well.

　　　　For the reasons set forth above, defendants are entitled to summary judgment on all

remaining claims.  Consequently, defendants' motion for summary judgment will be granted.

Appropriate orders will follow.

Date: September 4, 2025

　　　　　　　　　　　　　　　　　　　　s/David Stewart Cercone
　　　　　　　　　　　　　　　　　　　　David Stewart Cercone
　　　　　　　　　　　　　　　　　　　　Senior United States District Judge


cc:　　Joel S. Sansone, Esquire
　　　　Amanda N. Shields, Esquire
　　　　Elizabeth Tuttle, Esquire
　　　　Massimo A. Terzigni, Esquire
　　　　Francis D. Wymard, Esquire
　　　　Dennis R. Biondo, Jr., Esquire

　　　　(Via CM/ECF Electronic Mail)